## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **KLEBAN HOLDING COMPANY, LLC,** | : | |
| **PLAINTIFF,** | : | |
| | : | **CIVIL ACTION NO.** |
| **v.** | : | **3:11-CV-01879 (VLB)** |
| | : | |
| **ANN TAYLOR RETAIL, INC.,** | : | |
| **DEFENDANT.** | : | **November 26, 2013** |

### MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Dkt. #111] AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [Dkt. #115]

I.      **Introduction**

The Plaintiff, Kleban Holding Company, LLC ("Kleban"), brings this breach of contract action against the Defendant Ann Taylor Retail, Inc. ("Ann Taylor") for Ann Taylor's alleged default under a lease agreement between the two entities. Currently pending before the Court are cross motions for summary judgment. For the reasons that follow, the Defendant's Motion for Summary Judgment is GRANTED and the Plaintiff's Motion for Summary Judgment is DENIED.

II.      **Factual Background**

The following facts relevant to the motions for summary judgment are undisputed unless otherwise noted.  On November 30, 2000, Starwood Ceruzzi Post Road LLC (Starwood Ceruzzi) entered into a lease agreement (the "Lease") with Ann Taylor for retail premises (the "Store") within a shopping center (the

"Center") located at 1499 Post Road in Fairfield, Connecticut.  [Dkt. 114, D's 56(a)1 Stmt. ¶¶1, 2; *see also* Dkt. 113, Lease, p. 2].  In 2004 this Lease was assigned to Plaintiff Kleban as the successor-in-interest to Starwood Ceruzzi.  [Dkt. 114, D's 56(a)1 Stmt. ¶3; dkt. 117, P's 56(a)1 Stmt. ¶¶1, 15].  The initial term of the Lease was ten years.  [Dkt. 117, P's 56(a)1 Stmt. ¶2].  On April 11, 2011, Ann Taylor exercised its option to extend the Lease for the period of February 1, 2012 through January 31, 2017; Ann Taylor has one remaining option to extend the Lease for another five years, through January 31, 2022.  [*Id.* at ¶3].

The Lease provides that Minimum Annual Rent for the Store shall be paid in equal monthly increments of $14,175.00 during years eleven through fifteen of the Lease, payable "in advance on the first day of each calendar month of the tenancy without any set-offs or deductions whatsoever and without any prior demand being required therefor."  [Dkt. 113, Lease, ¶¶ 5, 5A; *see also* dkt. 117, P's 56(a)1 Stmt. ¶¶4, 5; dkt. 121, D's 56(a)2 Stmt. ¶5].

Paragraph 61 of the Lease, which forms the basis of the dispute in this case, reads as follows:

> 61. <u>CO-TENANCY</u>.  (a) <u>Opening</u>: Landlord agrees that the Delivery Date will not occur until Landlord notifies Tenant that eighty percent (80%) of the retail area of the Center is under construction and that Borders, Inc., Banana Republic and Victoria's Secret have executed leases on or before March 1, 2001.  If Landlord is unable to enter into such leases by March 1, 2001, Tenant shall have the right to terminate this Lease and Landlord shall reimburse Tenant for its reasonable out-of-pocket legal and architectural expenses.  Notwithstanding the foregoing, Landlord may replace Victoria's Secret or Banana Republic with a suitable replacement tenant.

>　　**(b)** <u>**Operating**</u>**: In the event Borders, Inc. or fifty percent (50%) of the other retail space in the Center, excluding Tenant, are not open and operating, Tenant shall be entitled to abate Minimum Annual Rent and in lieu thereof pay five percent (5%) of Gross Sales, not to exceed the Minimum Annual Rent otherwise payable in the absence of this paragraph, until the tenants meeting the foregoing requirements are again open and operating.**
>
>　　**Within thirty (30) days after the end of each calendar month that this Paragraph 61(b) shall be applicable, Tenant shall provide Landlord a statement showing the Gross Sales for such month and shall pay the amount due as percentage rent for such month. . .**

**[Dkt. 113, Lease, ¶ 61; *see also* dkt. 114, D's 56(a)1 Stmt. ¶5; dkt. 117, P's 56(a)1 Stmt. ¶¶8, 9].**

　　　　On April 11, 2000, Borders, Inc. ("Borders") signed a lease to rent space in the Center to operate a book store.  [Dkt. 117, P's 56(a)1 Stmt. ¶12].  On May 16, 2011, however, Borders closed its store in the Center in connection with its bankruptcy filing.  [Dkt. 114, D's 56(a)1 Stmt. ¶4; dkt. 117, P's 56(a)1 Stmt. ¶17].  On May 18, 2011 Kleban replaced Borders with Book Warehouse, which remained open and operating in the Center until closing on September 10, 2011.  [Dkt. 117, P's 56(a)1 Stmt. ¶¶18, 19].  On November 11, 2011 the Fairfield University Bookstore, in partnership with the Follett Higher Education Group, opened for business in the Center in Borders' former space.[1]  [*Id.* at ¶20].

---

**[1] The Fairfield University Bookstore sells books for the general public, children's books, electronics, university apparel, notebooks, greeting cards, and Vera Bradley purses, and also has a Starbucks coffee shop on premises.  [Dkt. 117, P's 56(a)1 Stmt. ¶21].  Kleban alleges that this store is equivalent to Borders.**

Since July 2011, approximately two months after Borders vacated its space in the Center, Ann Taylor has paid abated monthly rent in the amount of 5% of Gross Sales pursuant to paragraph 61 of the Lease rather than Minimum Annual Rent pursuant to paragraph 5A.  [Dkt. 114, D's 56(a)1 Stmt. ¶6; dkt. 117, P's 56(a)1 Stmt. ¶¶6, 24].  On July 12, 2011, Kleban mailed Ann Taylor a notice concerning non-receipt of Ann Taylor's Minimum Annual Rent for July 2011, and warning that failure to make payment of the full monthly rent within the time allotted in the Lease would result in Ann Taylor's default under the Lease.  [Dkt. 116-6, 7/12/11 Letter; dkt. 117, P's 56(a)1 Stmt. ¶23].  Ann Taylor has continued to pay reduced rent since receipt of Kleban's letter.

Kleban initiated this action in Connecticut Superior Court and Ann Taylor removed it to this court on December 2, 2011.  Kleban alleges three causes of action against Ann Taylor.  Count one alleges breach of the Lease agreement due to Ann Taylor's failure to fully and/or timely pay Minimum Annual Rent since Borders vacated the Center, which it contends constitutes a default under the Lease.  Count two alleges anticipatory breach of the Lease based on Ann Taylor's alleged intention to continuing paying abated rent under ¶ 61(b), and count three alleges unjust enrichment.  Both parties have moved for summary judgment.

III.  <u>Legal Standard</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of

proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record,

summary judgment may lie.  *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

IV.    <u>Discussion</u>

    a.  <u>Breach of the Lease Agreement</u>

Defendant Ann Taylor contends that the terms of the Lease clearly and unambiguously entitle it to pay reduced rent so long as Borders does not occupy the Center pursuant to paragraph 61(b).  Kleban, on the other hand, argues that paragraph 61(b) must be read to forbid Ann Taylor from continuing to pay reduced rent upon Kleban's replacement of Borders with another retailer. Because a lease is a contract and is "subject to the same rules of construction as other contracts," the Court must apply the rules of contract construction to determine whether Ann Taylor has breached the Lease by paying abated rent pursuant to ¶ 61.  *David Caron Chrysler Motors, LLC v. Goodhall's, Inc.*, 304 Conn. 738, 749 (2012) (citation omitted).  The Court will address the parties' arguments in turn.

"A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction."  *Murtha v. City of Hartford,* 303 Conn. 1, 7-8 (2011); *Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc.*, 300 Conn. 254, 260 (2011) ("[i]n ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into

consideration the circumstances of the parties and the transaction").  "The intent of the parties is to be ascertained by a fair and reasonable construction of the written words and ... the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the [writing]."  *Murtha*, 303 Conn. at 7 (quoting *19 Perry Street, LLC v. Unionville Water Co.*, 294 Conn. 611, 623 (2010)).  "[I]n construing contracts, we give effect to all the language included therein, as the law of contract interpretation ... militates against interpreting a contract in a way that renders a provision superfluous."  *Conn. Nat'l Bank v. Rehab Assocs.,* 300 Conn. 314, 322 (2011) (internal quotation marks and citation omitted).

Where the language of a contract is unambiguous, a court "must give the contract effect according to its terms."  *Harbour Pointe, LLC*, 300 Conn. at 260.  A contract is unambiguous when "its language is clear and conveys a definite and precise intent . . . .  The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity."  *Id.* (citation omitted); *Murtha*, 303 Conn. at 9 (same).  "[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous."  *Harbour Pointe, LLC*, 300 Conn. at 260 (citation omitted).  "It is well established that [w]here there is definitive contract language, *the determination of what the parties intended by their contractual commitments is a question of law.*"  *Id.* at 259-60 (citation omitted); *Cruz v. Visual Perceptions, LLC,* 136 Conn. App. 330, 334 (2012), *cert. granted on other grounds*, 306 Conn. 903 (2012) (same); *Murtha,* 303 Conn. at 8 ("if a contract is unambiguous within its

four corners, the determination of what the parties intended by their contractual commitments is a question of law."); *19 Perry St., LLC*, 294 Conn. at 622-23 ("[w]here a party's intent is expressed clearly and unambiguously in writing, however, the determination of what the parties intended ... is a question of law [over which our review is plenary].") (citation omitted).  In other words, "[t]he question is not what intention existed in the minds of the parties but what intention is expressed in the language used."  *Barnard v. Barnard*, 214 Conn. 99, 110 (1990) (citation omitted).  Thus,

> courts do not unmake bargains unwisely made.  Absent other infirmities, bargains moved on calculated considerations, and whether provident or improvident, are entitled nevertheless to sanctions of the law.... Although parties might prefer to have the court decide the plain effect of their contract contrary to the agreement, *it is not within its power to make a new and different agreement; contracts voluntarily and fairly made should be held valid and enforced in the courts*.

*Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., L.P.*, 252 Conn. 479, 505-06 (2000) (citation omitted).  Further, "a presumption that the language used is definitive arises when … the contract at issue is between sophisticated parties and is commercial in nature."  *United Illuminating Co. v. Wisvest-Connecticut, LLC*, 259 Conn. 665, 670 (2002); *Connecticut Nat. Bank v. Rehab Assocs.*, 300 Conn. 314, 319 (2011) (same); *W. Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 146 Conn. App. 169, --- A.3d ---, at *9 (2013) (same).

        Where the language of a contract is ambiguous, however, a court must construe those ambiguities against the contract's drafter.  *Harbour Pointe, LLC*, 300 Conn. at 260.  Any ambiguity in a contract "must emanate from the language

used by the parties" and "a contract is ambiguous if the intent of the parties is

not clear and certain from the language of the contract itself."  *Id.* at 260-61

(citation omitted); *Murtha*, 300 Conn. at 9 (same).

> The contract must be viewed in its entirety, with each
> provision read in light of the other provisions ... and every
> provision must be given effect if it is possible to do so.... If the
> language of the contract is susceptible to more than one
> reasonable interpretation, the contract is ambiguous.

*Harbour Pointe, LLC*, 300 Conn. at 261 (citation omitted).

Where a contract is ambiguous or does not set forth the entire agreement

between the parties, "the court may look to parol evidence to explain the

ambiguity or add a missing term."  *Murtha*, 303 Conn. at 12.  *See also Hartford

Acc. & Indem. Co. v. Ace Am. Reinsurance Co.*, 284 Conn. 744, 771, 936 A.2d 224,

240 (2007) ("extrinsic evidence may be considered in determining contractual

intent only if a contract is ambiguous."); *United Illuminating Co.*, 259 Conn. at 675

(where a contract is ambiguous, the court may properly discern the intent of the

parties as to its meaning by considering extrinsic evidence).  "[A]ttempting to

establish what the contract should have been, rather than what it was, is the

exact conduct proscribed by the parol evidence rule."  *Stamford Wrecking Co. v.

United Stone Am., Inc.*, 99 Conn. App. 1, 12 (2007).  In other words, "[t]he parol

evidence rule ordinarily prohibits a court from considering extrinsic evidence in

interpreting an agreement when that evidence tends to alter the explicit terms of

the agreement."  *Battalino v. Van Patten*, 100 Conn. App. 155, 167 (2007) (citation

omitted).  "Parol evidence offered solely to vary or contradict the written terms of

an *integrated* contract ... is *inadmissible* not because it is parol evidence, but

because it is irrelevant."  *Stamford Wrecking Co.,* 99 Conn. App. at 9 (emphasis
added).  This parol evidence rule "is not an exclusionary rule of evidence … but a
rule of substantive contract law."  *Id.* (citation omitted).

Ann Taylor posits that paragraph 61(b) unambiguously provides that,
where Borders is not open and operating, Ann Taylor is entitled to pay rent in the
amount of 5% of Gross Sales in lieu of the Minimum Annual Rent specified in ¶ 5.
Ann Taylor further contends that, because Borders permanently closed its doors
at the Center (and, indeed, nationally), Borders' departure from the Center may
not be remedied by Borders' replacement for purposes of abated rent under ¶ 61,
thus entitling Ann Taylor to pay abated rent for the life of the Lease.  Kleban, on
the other hand, contends that subsection (b) does not allow Ann Taylor to
continue paying reduced rent upon Kleban's replacement of Borders with another
retailer.  The Court will look first to the language of the Lease and will address the
parties' arguments in turn.

As an initial matter, the Court notes that there is no dispute that Starwood
Ceruzzi and both parties to this case are sophisticated entities or that the Lease
at issue is commercial in nature.  As such, there is a presumption that the
language used in the Lease, including disputed paragraph 61, is definitive.
*United Illuminating Co.*, 259 Conn. at 670.

As recited above, paragraph 61(b) of the Lease, pursuant to which Ann
Taylor has paid abated rent since July 2011, upon Borders' departure, and which
is entitled "Co-Tenancy," provides in essence that in the event Borders, Inc. is

**10**

not open and operating, Ann Taylor shall be entitled to abate Minimum Annual Rent and in lieu thereof pay five percent (5%) of Gross Sales, not to exceed the Minimum Annual Rent otherwise payable in the absence of paragraph 61, until the tenants meeting the foregoing requirements are again open and operating.  It further provides that within thirty (30) days after the end of each calendar month that paragraph 61(b) is applicable, Tenant shall provide Landlord a statement showing the Gross Sales for such month and shall pay the amount due as percentage rent for such month.  [Dkt. 113, Lease, ¶ 61].

Ann Taylor contends that this clause unambiguously allows it to pay percentage rent under two conditions: (a) where Borders is not open and operating, or (b) where fifty percent of the remaining retail space, excluding Ann Taylor, is not open and operating.  [Dkt. 112, D's MSJ p. 7].  The plain language of ¶ 61 supports Ann Taylor's position.  The Merriam Webster Dictionary defines the word "or," among other things, as "a function word to indicate an alternative."  *Or Definition*, m-w.com, http://www.merriam-webster.com/dictionary/or (visited Nov. 20, 2013).  The common and natural reading of the "or" clause in ¶ 61(b) reflects that subsection (b) deals with *two* potential events that are separate and independent of one another: *either* Borders *or* fifty percent of the remaining retail space, excluding Ann Taylor, are not open and operating.  In other words, the presence of the word "or" in ¶ 61(b) means that both subjects of the "or" clause may function independently of one another.  The first portion of 61(b), when severed to demonstrate the two distinct conditions permitting the payment of reduced rent, would read as follows:

> **Condition A:  In the event Borders, Inc. [ ] [is] not open and operating, Tenant shall be entitled to abate Minimum Annual Rent and in lieu thereof pay five percent (5%) of Gross Sales, not to exceed the Minimum Annual Rent otherwise payable in the absence of this paragraph, until the tenants meeting the foregoing requirements are again open and operating;**
>
> ***or***
>
> **Condition B:  In the event [ ] fifty percent (50%) of the other retail space in the Center, excluding Tenant, are not open and operating, Tenant shall be entitled to abate Minimum Annual Rent and in lieu thereof pay five percent (5%) of Gross Sales, not to exceed the Minimum Annual Rent otherwise payable in the absence of this paragraph, until the tenants meeting the foregoing requirements are again open and operating.**

Thus, ¶ 61(b) clearly and unambiguously calls for the payment of reduced rent upon *either* of the above two conditions precedent.

Kleban contends that the parties' use of the generic term "tenants" in paragraph 61(b) rather than of specific company names indicates "that any reasonable 'tenant' open and operating in the Border's space would re-trigger Ann Taylor's obligation to pay minimum annual rent under the Lease" and that the parties referred to Borders merely "for convenience purposes in describing that large, single-tenant area of retail space within the Center."  [Dkt. 116, P's MSJ p. 7; Dkt. 118, P's Opp. to D's MSJ p. 3, ¶2].  In other words, Kleban contends that if the parties intended that Ann Taylor's payment of full rent be contingent upon Borders' occupation of the space, the parties would have so specified; instead, paragraph 61(b) "simply says that if Borders or any other tenants are 'not open and operating,' Tenant (Ann Taylor) may abate minimum annual rent 'until the

tenants meeting the foregoing requirements [whoever they may be] are again open and operating."  [Dkt. 116, P's MSJ p. 7].

First, the parties' choice to name Borders, Inc. specifically rather than to employ a description of the premises Borders occupied militates strongly in favor of a finding that the Lease language is definitive.  Had the parties intended to define the term "Borders, Inc." to refer to the *space* that Borders occupied rather than to the retailer itself, or to Borders, Inc. *or an equivalent retailer*, the parties could have done so.  Indeed, no defined term in the lease indicates that "Borders, Inc." may refer to anything but Borders, Inc. as a specific retail store occupying space in the Center.  In fact, the parties chose to name specific retailers in ¶ 61(a) (ie, Banana Republic, Victoria's Secret, and Borders, Inc.) and neither party now contends that those terms are mere proxies for the *space* occupied by the named entities.

Second, Kleban's interpretation of the term "tenants" as used in ¶ 61(b) is unsustainable based on the plain language of the Lease.  When read in light of the "or" clause allowing for reduced payment upon either of two conditions, the term "tenants" must describe the subjects of the respective conditions, namely Borders or "fifty percent (50%) of the other retail space in the Center, excluding Tenant."  Ann Taylor was entitled to pay reduced rent upon either of the two conditions above "until the tenants meeting the foregoing requirements are again open and operating."  When the two conditions are severed, it is clear that "tenants meeting the foregoing requirements" are defined as *either* Borders, Inc. *or* fifty percent of the remaining retail space, excluding Ann Taylor.  In other

**13**

words, "tenants" refers to the subject of each individual condition under the "or"
clause:

> In the event *Borders, Inc*. [ ] [is] not open and operating,
> Tenant shall be entitled to abate Minimum Annual Rent and in
> lieu thereof pay five percent (5%) of Gross Sales … until the
> tenants *meeting the foregoing requirements* are again open
> and operating.

(emphasis added).  The requirement of the above condition is that Borders, Inc.

be open and operating.  The plain language of the Lease dictates that Ann Taylor

may pay abated rent until the tenant meeting the foregoing requirement is again

open and operating.  The only tenant who could fulfill such a requirement is

Borders, Inc.  Kleban's argument that "Borders, Inc." actually means "the retail

space currently occupied by Borders, Inc." is illogical based on the plain

language of the Lease.

Ann Taylor has offered an interpretation of the phrase "until tenants

meeting the foregoing requirements are again open and operating" that differs

from both Kleban's and this Court's interpretations.  Ann Taylor posits that this

phrase does not modify Borders, but instead only modifies the unrented fifty

percent of the retail space as, grammatically, "a qualifying clause does not need

to modify both 'events' just like an adverb can modify one adjective or more than

one adjective in a sentence separated by the word 'or,'" and because the word

"or" in ¶ 61(b) is disjunctive.  Ann Taylor further explains that if ¶ 61(b) stated

"Borders, Inc. or an equivalent tenant," then the above phrase would modify both

Borders and "fifty percent of the other retail space."  [Dkt. 112, D's MSJ p. 8].

Even if Ann Taylor's interpretation is correct, the consequence of the Lease

14

language is identical: if Borders, Inc. is *not* open and operating, Ann Taylor may pay reduced rent.

Kleban also argues that, when read as a whole and in conjunction with subsection (a), paragraph 61 demonstrates that Kleban is "not prohibited from replacing Borders and thereby re-activating minimum annual rent."  [Dkt. 116, MSJ p. 6].  Subsection (a) reads as follows:

> **(a) Opening: Landlord agrees that the Delivery Date will not occur until Landlord notifies Tenant that eighty percent (80%) of the retail area of the Center is under construction and that Borders, Inc., Banana Republic and Victoria's Secret have executed leases on or before March 1, 2001.  If Landlord is unable to enter into such leases by March 1, 2001, Tenant shall have the right to terminate this Lease and Landlord shall reimburse Tenant for its reasonable out-of-pocket legal and architectural expenses.  Notwithstanding the foregoing, *Landlord may replace Victoria's Secret or Banana Republic with a suitable replacement tenant*.**

[Dkt. 113, Lease, ¶ 61(a) (emphasis added)].  Kleban notes that while subsection (a) specifically allows for Banana Republic's or Victoria's Secret's replacement by a suitable replacement tenant in connection with the opening of the Center, subsection (a) is silent as to Borders' replacement, which implies that replacement is not allowed.  Thus, Kleban concludes, "[i]f the parties wanted to prohibit the replacement of Borders in connection with both the 'Opening and the 'Operating' phases of the Center, they surely could and would have stated such prohibition in paragraph 61(b), as they seemingly did in paragraph 61(a)."  [Dkt. 116, MSJ p. 7].

**15**

Kleban's argument warrants no merit.  As noted, the language of subsection (b) unambiguously prohibits Borders' replacement for purposes of Ann Taylor's payment of reduced rent.  Moreover, even if the Court were to credit Kleban's construction of subsections (a) and (b), Kleban's conclusions are erroneous.  Subsection (a) contains a passive prohibition; it explicitly states that Banana Republic and Victoria's Secret may be replaced, and thus the parallel implication is that Borders is not replaceable.  While Kleban argues that the parties could and would have specifically stated in subsection (b) that Borders were irreplaceable if that were their intent, Kleban ignores that no such *explicit* prohibition exists in subsection (a).  Rather, subsection (a) makes a specific allowance for the replacement of Banana Republic and Victoria's Secret.  Thus, if the Court were to follow Kleban's suggestion that sections (a) and (b) are similarly constructed, the logical conclusion must be that if the parties intended a substitution for Borders, they would have explicitly so stated, as they did for the tenants in section (a).

Alternatively, Kleban argues that any argument based on the language of ¶ 61(a), which contains terms related to the opening of the Center, is unavailing because that paragraph specifically allowed for the replacement of Victoria's Secret and Banana Republic but not of Borders *only* because Borders had already signed a lease while Victoria's Secret and Banana Republic had not.  Thus, because prior landlord Starwood Ceruzzi had already satisfied the opening condition that Borders execute a lease by a certain date, there was no need to carve out a right to replace Borders in the event that Borders did not execute a

**16**

lease in the future.  The need remained, however, as to Victoria's Secret and Banana Republic, which had not executed leases at the time Ann Taylor executed its Lease.  Thus, Kleban posits, "it would perhaps mean the parties to the Lease did not intend to prohibit the replacement of any tenant, whether at 'Opening' or during 'Operating.'"  [Dkt. 116, P's MSJ p. 8].  This argument must be rejected.  Regardless of whether Borders was replaceable for purposes of subsection (a), subsection (b) clearly contemplates that Borders was not replaceable for purposes of Ann Taylor's payment of reduced rent during the operating phase of the Center.  Further, that Borders had already executed a Lease at the time that Ann Taylor executed its own lease credits the parties' inclusion of specific language precluding Borders' replacement for purposes of reduced rent.  Kleban's argument is inapposite.

Although the language of paragraph 61 is clear on its face, the Court must give full meaning and effect to all the language included in a contract, as the law of contract interpretation militates against interpreting a contract in a way that renders a provision superfluous.  Kleban posits that Ann Taylor's interpretation of ¶ 61(b) directly conflicts with the language of ¶ 54, which states in relevant part that

> Nothing contained in this lease or any Exhibit or Rider attached hereto shall be construed, deemed or interpreted to be a warranty, representation or agreement on the part of Landlord that any department or regional or national chain store or other merchant shall open or remain open for business or occupy or continue to occupy any premises in or adjoining the Center during the term of this lease or any renewal or extension thereof.

[Dkt. 113, Lease ¶ 54].

Simple analysis of these two paragraphs demonstrates that they are not in conflict and are not mutually exclusive.  While ¶ 54 notes that the Lease does *not* warranty that any particular retail tenant will occupy or remain at the Center for any given time, it also does not contain any language prohibiting the parties from contracting for reduced rent if certain retail tenants vacate the property.  Ann Taylor's payment of reduced rent and Kleban's agreement to allow payment of reduced rent under ¶ 61 in no way creates any representation or warranty obligations on Kleban's part, nor does it obstruct the parties' understanding that Kleban had no authority to warranty or represent that a retail store over whose finances and management it had no power would remain in business indefinitely.

As to Kleban's contention that "the Lease does not contain any other express provision that says Borders, and only Borders, must be at the Center at all times after signing its lease," Kleban is correct.  [Dkt. 116, P's MSJ p. 16]. Although ¶ 61(b) provides for reduced rent if Borders ceases to be open and operating, nothing in the Lease obligates Borders to remain in occupancy ad infinitum.  Rather, the Lease simply provides that in the event that Borders leaves the Center, Ann Taylor will pay reduced rent.  Nothing in ¶ 61 obligates Borders to remain at the Center for any amount of time, nor could this Lease legally obligate Borders to remain at the Center as Borders is not a party to the Lease and thus has no obligations under it.

Kleban also argues that Ann Taylor's interpretation of the Lease leads to absurd results and thus is invalid.  As an example, Kleban asserts that "if instead of going bankrupt, Border's [sic] was now refusing to pay a penny of rent, intentionally destroying their space and selling illegal drugs, under Ann Taylor's interpretation of the Lease Kleban Holding would not be able to evict Borders to get a new tenant because it would violate paragraph 61 of the Lease and Ann Taylor could then pay 50% less rent."  [Dkt. 116, P's MSJ p.15].  Kleban's argument is patently false.  Nothing in the Lease prohibited Kleban from evicting Borders or any other tenant, nor does any reasonable reading of the Lease lead to the conclusion that Kleban would be in violation of ¶ 61 if it evicted Borders.  As discussed previously, ¶ 61 merely provides that *if Borders vacates the property, Ann Taylor pays reduced rent.*  The Lease does not contemplate this event as constituting a breach.  Indeed, it is equally untrue that if fifty percent of the remaining retail space is not open and operating pursuant to ¶ 61(b), Kleban would be in violation of the Lease.

Finally, Kleban argues in passing that Ann Taylor's "$800,000+ windfall," coupled with various inconsistencies Kleban has purported to find based on extrinsic evidence (discussed briefly later in this decision), makes Ann Taylor's interpretation of the Lease illogical as "[n]o reasonable owner … would have agreed to a clause that would create the result that Ann Taylor claims."  [Dkt. 116, P's MSJ p. 17; *see also* dkt. 118, P's Opp. to D's MSJ p. 2].  Kleban, however, wholly ignores the law of contract interpretation and the clear terms of the Lease in making this argument.  In fact, the parties – both of whom were sophisticated

commercial entities – *did* include ¶ 61 in the Lease, and ¶ 61 is clear and unambiguous in its meaning.  That Ann Taylor has found itself providently situated as a result of ¶ 61(b) is irrelevant; "courts do not unmake bargains unwisely made."  *Tallmadge Bros., Inc.*, 252 Conn. at 505-06 (citation omitted).  The parties in this case entered into a sophisticated commercial lease.  Neither party asserts that it was the victim of fraud or duress, or that the relative positions of the parties were unequal during the Lease negotiation process.  In fact, Starwood Ceruzzi, whose leases Kleban assumed, had the benefit of drafting the Lease.  Thus,

> [e]ven if the result of the fair and logical enforcement of th[e] unambiguous agreement[] seems unduly to burden one of the parties, [the court] decline[s] to embark a voyage into uncharted waters in which untrammeled and unrestrained judicial revisionism would depart significantly from an aspect of contract law upon which contracting parties reasonably can be assumed to have relied for many years.

*Id.* at 506 (declining to revise an unambiguous settlement agreement upon which sophisticated parties had agreed).

The Court concludes that the language of the Lease is clear and unambiguous in allowing Ann Taylor to pay reduced rent when Borders is not open and operating in the Center.  Paragraph 61(b), when read in conjunction with the rest of the Lease, conveys a definite and precise intent and therefore this Court "will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity."  *Harbour Pointe, LLC*, 300 Conn. at 260.  No ambiguity emanates from the language used by the parties.  Although it appears that Kleban now finds itself a party to a "bargain unwisely made," this Court has no authority

to unmake a deal agreed upon by two sophisticated parties to a commercial contract whose language is presumed to be definitive.  As the Lease language is definitive that Ann Taylor may pay reduced rent and the parties agree that Ann Taylor has been paying reduced rent since 2011 pursuant to ¶ 61, Ann Taylor has neither breached nor anticipatorily breached the Lease.

### i. Parol Evidence

Notwithstanding Kleban's above arguments, the main focus of Kleban's allegation that Ann Taylor is prohibited from paying reduced rent if Kleban has filled the Borders space is the 2012 deposition testimony of two representatives of Starwood Ceruzzi, Ann Taylor's prior Landlord and signatory to the Lease. Kleban has offered testimony from Louis Ceruzzi, Jr., President of Starwood Ceruzzi LLC and signatory to the Lease on behalf of Starwood Ceruzzi Post Road LLC, and from Cynthia Ellis, senior vice president and associate general counsel of Ceruzzi Properties LLC, and the drafter of the Lease, purportedly supporting its interpretation of ¶ 61 and in which both testified that it was not their intention to draft or enter into a lease that precluded the landlord from substituting a tenant for Borders or restoring Ann Taylor's obligation to pay Minimum Annual Rent.  In response, Ann Taylor argues that this parol evidence is irrelevant and thus inappropriate to the Court's analysis given the unambiguous Lease language. Ann Taylor further posits that even if extrinsic evidence may be considered, written documentation contemporaneous with the drafting of the Lease supports Ann Taylor's own interpretation of ¶ 61.

The extrinsic evidence offered by the parties is unpersuasive in light of the clear and unambiguous language of the contract.  As the Connecticut Supreme Court has observed, "the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous."  *Harbour Pointe, LLC*, 300 Conn. at 260 (citation omitted).  Because the meaning of the Lease is unambiguous, this Court is prohibited from considering parol evidence.  *See Hartford Acc. & Indem. Co.*, 284 Conn. at 771 ("extrinsic evidence may be considered in determining contractual intent only if a contract is ambiguous."); *Stamford Wrecking Co.*, 99 Conn. App. at 12 ("attempting to establish what the contract should have been, rather than what it was, is the exact conduct proscribed by the parol evidence rule.").  Such evidence is irrelevant.

### b. Unjust Enrichment

Ann Taylor argues that Plaintiff's unjust enrichment claim must fail as a matter of law because the written Lease upon which the claim is based is enforceable.  Kleban has neither addressed Ann Taylor's argument nor cited any legal authority in opposition.  Further, Kleban does not generally claim that the Lease is unenforceable.  Rather, Kleban's theory of recovery is based on its request that the Court enforce the Lease pursuant to its own interpretation of the Lease's terms.

Under Connecticut law Plaintiff's unjust enrichment claim fails.  "[Q]uantum meruit and unjust enrichment are common-law principles of

22

restitution; both are noncontractual means of recovery without [a] valid contract...."  *BHP Land Servs., LLC v. Seymour*, 137 Conn. App. 165, 169 (2012) (quoting *Gagne v. Vaccaro*, 255 Conn. 390, 401 (2001), *on appeal after remand*, 80 Conn. App. 436 (2003), *cert. denied*, 268 Conn. 920 (2004)).  "[U]njust enrichment relates to a benefit of money or property ... and applies when no remedy is available based on the contract.... The lack of a remedy under a contract is a precondition to recovery based on unjust enrichment."  *Id.*  (citation omitted). "Proof of a contract enforceable at law precludes the equitable remedy of unjust enrichment; at least in the absence of a breach of the contract by the defendant; or a mutual rescission of the contract."  *Feng v. Dart Hill Realty, Inc.*, 26 Conn. App. 380, 383 (1992).

The commercial Lease at issue is a contract between two sophisticated parties which is unambiguous and enforceable as drafted.  Ann Taylor has not breached the Lease, nor have the parties rescinded the Lease.  Thus, Plaintiff's unjust enrichment claim – which Plaintiff has not addressed in either its Motion for Summary Judgment or in its Opposition to Ann Taylor's motion – must be dismissed.  *See Berman & Sable v. Nat'l Loan Investors, LP*, No. X06CV000167145S, 2002 WL 194528 (Conn. Super. Ct. Jan. 16, 2002) (declining to revise an express contract for attorneys' fees via an unjust enrichment theory because "[a] claim for unjust enrichment is not available in the situation where there is an enforceable express contract between the parties").

c.  <u>Legal Fees and Costs</u>

Ann Taylor requests that, if it prevails in this action, it be allowed to present an affidavit describing the costs and fees incurred in this litigation pursuant to ¶ 34 of the Lease, which provides that "[i]n any litigation arising out of this Lease involving Landlord and Tenant, the prevailing party shall be entitled to recover all costs, expenses and reasonable attorney's fees that have been incurred in connection therewith."  [Dkt. 113, Lease, ¶ 34(f)].  As Ann Taylor is the prevailing party in this action, it is entitled to reimbursement pursuant to ¶ 34. Ann Taylor may file affidavits and/or other materials demonstrating the reasonable costs, fees, and expenses incurred in this litigation, preferably within 35 days of the date of this judgment.

V.    <u>Conclusion</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED.  The Clerk is directed to enter judgment in favor of the Defendant and to close the case.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: November 26, 2013

24